IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re FRANK MATTHEW HOGLE and CHARLENE ANNE HOGLE, <br><br> Debtors. <br><br> In re HAROLD BRUCE HOGLE and KIMBERLY RAE HOGLE, <br><br> Debtors. | Chapter 7 <br><br> Case No. 11-bk-08991-SSC <br> Case No. 12-bk-00046-GBN <br><br> Adv. No. 11-ap-1205–SSC <br> (Consolidated with Adversary Case No. 12-ap-183) <br><br> (Not for Publication- Electronic Docketing ONLY) |
| GARY SMESTAD, et al., <br>              Plaintiffs, <br> v. <br><br> FRANK MATTHEW HOGLE, CHARLENE ANNE HOGLE, HAROLD BRUCE HOGLE, and KIMBERLY RAE HOGLE <br>              Defendants. | MEMORANDUM DECISION |

1

# I. INTRODUCTION

This matter comes before the Court on the Plaintiffs' Motion for Partial Summary Judgment ("Motion") against Frank Matthew Hogle and Charlene Hogle, and Harold and Kimberly Hogle, filed on October 5, 2012, and the Response and Reply filed thereto.[1] On January 10, 2013, the Court heard oral argument on the current Motion and took the matter under advisement. The Motion alleges non-dischargeability pursuant §523(a)(19)–violation of securities laws. There is disagreement as to whether bankruptcy courts may determine liability arising from alleged violations of securities laws for purposes of dichargeability under § 523(a)(19).[2] This Court raised the issue at oral argument. The parties consented to this Court's authority and requested the Court make a determination of liability under the Arizona securities law. Therefore, in this Memorandum Decision, the Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The issues addressed herein constitute a core proceeding over which this Court has jurisdiction pursuant to the parties' consent. 28 U.S.C. §§ 1334(b) and 157(b) (West 2013).

---

**1.** A separate adversary proceeding had been initiated against Harold and Kimberly Hogle in connection with their administrative case, but it was subsequently consolidated with the adversary against Frank Matthew Hogle and Charlene Hogle.

**2.** Before 2005, the language in § 523(a)(19) explicitly limited this discharge exception to pre-petition judgments finding a violation of securities law. Clearly, this precluded a bankruptcy court from making a determination of securities violations and entering such a judgment. In 2005, the language was changed to allow for the exception to be based on judgments made "before, on, or after the date on which the petition was filed." Some bankruptcy courts have interpreted this change to mean that bankruptcy courts may now determine whether a party violated the securities laws. *See* In re Chan, 355 B.R. 494, 497 (Bank. E.D. Pa. 2006); In re Jensen-Ames, 2011 WL 1238929 (Bank. W.D. Wash. 2011). Others have concluded that the new language merely affected a temporal change, allowing plaintiffs to obtain a judgment post-petition (and after obtaining appropriate stay relief) in courts other than the bankruptcy court. *See* In re Jafari, 401 B.R. 494 (Bankr. D. Colo. 2009); In re Pujdak, 462 B.R. 560 (Bankr. D. S.C. 2011). In re Bundy, 468 B.R. 916, 918 (Bank. E.D. Wash. 2012); In re Anderson, 2012 WL 3133827 (Bank. D. Idaho 2012).

## II. FACTUAL BACKGROUND

In 2006, Debtor Frank Matthew Hogle ("Matt Hogle") and his brother Harold Hogle (collectively, the "Hogles") formed an Arizona limited liability company known as True Imaging LC ("True Imaging"). The Hogles were the only shareholders and True Imaging was managed by True Imaging Management Corporation, an Arizona corporation. The business of True Imaging was to establish a medical imaging center for patients referred by physicians in the metropolitan Phoenix area. In connection with promoting investment in the company, True Imaging issued a Private Placement Memorandum ("PPM") to potential investors, including the Plaintiffs, dated May 1, 2007. True Imaging also promulgated two other documents in connection with the sale of securities: (1) "True Imaging LC: The Opportunity" and (2) "Executive Summary for True Imaging, LC."

In sum, the PPM provided that True Imaging was to sell a minimum of 5 Units and a maximum of 8,000 units at a price of $1,000 per unit. True Imaging would then keep the proceeds in a segregated bank account in the metropolitan Phoenix area until the company either entered a lease with Hogle Brothers LLC ("Hogle Bros.")–a company owned by Matt and Harold Hogle– or purchased certain medical imaging equipment. True Imaging eventually was to use the proceeds to purchase medical imaging equipment, to fund tenant improvements and other capital improvements, to provide working capital, and to cover the costs of the offering.

## III. DISCUSSION

### A. Standard for Summary Judgment

A motion for summary judgment should be granted if the movant has shown that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Bankr.P. 7056(c). Ruling on a motion for summary judgment necessarily implicates that substantive evidentiary standard of proof which would apply at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 252, 106 S.Ct. 2505 at 2512, 91 L.Ed.2d 202 (1986); FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010). A material fact is

genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. Procedurally, "the proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." In re Younie, 211 B.R. 367, 372 (9th Cir. BAP 1997). Once that burden has been met, "the opponent must affirmatively show that a material issue of fact remains in dispute." Id.

The opponent may not assert the existence of some alleged factual dispute between the parties. Liberty Lobby, 477 U.S. 242 at 252, 106 S.Ct. 2505 at 2512, 91 L.Ed.2d 202; " Younie, 211 B.R. at 372. Instead, to demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge, and the facts set forth therein must be admissible in evidence. Younie, 211 B.R. at 372. In addition, summary judgment is reviewed in the light most favorable to the non-moving party. In re SNTL Corp., 571 F.3d 826, 834 (9th Cir. 2009); Younie, 211 B.R. at 372.

### B. § 523(a)(19) Non-Dischargeability Claims: Violation of A.R.S. § 44-1991

Pursuant to 11 U.S.C. § 523(a)(19), a monetary debt is nondischargeable to the extent that it is for the violation of any federal or state securities laws (or related regulations or orders) resulting in a judgment, order, consent order, or decree entered in any federal or state judicial or administrative proceeding. The parties here have agreed that the bankruptcy court may enter such an order finding a violation of securities law. Therefore, this Court must determine whether Defendant Debtors violated relevant Arizona securities law.

Arizona securities fraud law is governed by Sections 44-1991 to 44-2000. Section 44-1991 provides:

> A. It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, including securities exempted under § 44-1843 or 44-1843.01 and including transactions exempted under § 44-1844, 44-1845 or 44-1850, directly or indirectly to do any of the following:

4

> 1. Employ any device, scheme or artifice to defraud.
> 2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
> 3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.
>
> B. In a private action brought pursuant to subsection A, paragraph 2 of this section or § 44-1992, if the person who offered or sold the security proves that any portion or all of the amount recoverable under subsection A, paragraph 2 of this section or § 44-1992 represents an amount other than the depreciation in value of the subject security resulting from the part of the prospectus or oral communication, with respect to which the liability of the person is asserted, not being true or omitting to state a material fact required to be stated or necessary to make the statement not misleading, then the amount shall not be recoverable. This subsection does not apply to any actions based on allegations of activities constituting dishonest or unethical practices in the securities industry.

Ariz. Rev. Stat. Ann. § 44-1991 (2013). The Arizona legislature "made the task of proving securities fraud much easier than proving common-law fraud." Aaron v. Fromkin, 196 Ariz. 224, 227, 994 P.2d 1039, 1042 (Ariz. Ct. App.2000). Under section 44-1991(A)(2), a plaintiff need not demonstrate the existence of damages. *See* Aaron, 196 Ariz. at 227. A plaintiff must only prove that a misrepresentation of material fact was made in the sale of securities Id. (citing State v. Superior Court of Maricopa Cnty., 123 Ariz. 324, 331, 599 P.2d 777, 784 (1979)). It is not necessary to show either that the speaker had knowledge of the statement's falsity or that the statement was material to the particular buyer. Aaron, 196 Ariz. at 227. A plaintiff must merely show that the statements were material and misleading to a reasonable buyer. Id. An omitted fact is considered material if there is a "showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable (buyer)." Rose v. Dobras, 128 Ariz. 209, 214, 624 P.2d 887, 892 (Ariz. Ct. App. 1981) (quoting T.S.C. Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 767 (1976)).

Section 44-1999 provides that any person who controls a person liable under

5

§ 44-1991 is jointly and severally liable with the "controlled person" unless the controlling person acted in good faith and did not directly or indirectly induce the act underlying the action. The controlling person does not need to participate in the underlying sale or purchase of securities. E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n, 206 Ariz. 399, 412, 79 P.3d 86, 99 (Ariz. Ct. App. 2003). Instead, the controlling person is liable as long as the person had direct or indirect "possession of the *power to direct or cause the direction of the management and policies of a person*, whether through the ownership of voting securities, by contract, or otherwise." Id. (quoting the SEC's definition of "control" found in 17 C.F.R. § 230.405). Here, the Hogles clearly controlled True Imaging and directly induced the Plaintiffs to invest in True Imaging. Thus, the Hogles are within the definition of a "controlling person" and are jointly and severally liable for any acts of securities fraud perpetrated by True Imaging.

The Plaintiffs make nine (9) allegations of material misrepresentations or omissions. Each will be addressed in turn.

### i. The Hogles never disclosed to Plaintiffs the fact that the Arizona State Board of Chiropractors had disciplined Debtor Matt Hogle

The Plaintiffs argue that disciplinary actions taken against Matt Hogle by the Arizona State Board of Chiropractors ("the Board") should have been disclosed to potential investors in True Imaging. They presented a Consent Order entered into between Matt Hogle and the Board on November 14, 2005, which placed Matt Hogle on probation for two years. The Plaintiffs contend that this constitutes a material omission that the Plaintiffs–and a reasonable buyer–would want to know prior to investing in True Imaging. As a preliminary matter, the Defendants argue that the Consent Order is inadmissible because paragraph seven of the Consent Order provides that:

> All admissions made by Respondent in this Consent Agreement are made solely for the final disposition of this matter, and any related administrative proceedings or civil litigation involving the Board and Respondent. Therefore, any admissions made by Respondent in this Consent Agreement are not intended for any other use, such as in the context of another regulatory agency's

6

Case 2:11-ap-01205-GBN    Doc 54    Filed 03/13/13    Entered 03/13/13 15:32:32    Desc
Main Document    Page 6 of 15

proceedings, or civil or criminal proceedings, whether in the State of Arizona or in any other state or federal court.

The Defendants fail to mention paragraph 11 in which Matt Hogle, as Respondent, recognized that the Consent Agreement is a public record that may be publicly disseminated as a formal action of the Board. Therefore, the Court finds the agreement admissible as a public record. Fed. R. Evid. 1005.

The Consent Order indicates that Matt Hogle was to have been on probation through December 2007, meaning that he was to have been on probation when the PPM was issued on May 1, 2007. Defendants have offered evidence that the Board, in fact, terminated the probation on February 15, 2007. Thus, Matt Hogle was not on probation at the time the PPM was disseminated. Nevertheless, this Court finds that the failure to disclose Matt Hogle's disciplinary history with the Board was a material omission.

Defendants argue that the omission in this case is similar to that of a defendant in Strategic Diversity, Inc. v. Alchemix Corp., in which the Ninth Circuit held that the defendant's failure to disclose to potential investors that he was a defendant in a securities fraud case involving a separate business was not a material omission. Strategic Diversity Inc. v. Alchemix Corp., 666 F.3d 1197 (9th Cir. 2012). This case is factually distinguishable. First, the defendant in Strategic Diversity did not have an order or judgment, based on a stipulation or a determination by a trier of fact, entered against him. One may assume that the defendant had appropriate defenses to the allegations being made by the plaintiff. However, in this matter, Matt Hogle agreed to have a Consent Order entered in the public record that placed him on probation.

Second, in Strategic Diversity, the defendant omitted the fact that he was the defendant in a securities fraud case related to a completely separate company that "was in no way related to Alchemix [the defendant's company issuing the securities] (except by [the defendant's] association), and it was not connected to the instant transaction." Here, the Hogles operated several related entities that were actually involved in the True Imaging offering and would determine whether the offering would be successful. They were the shareholders of True

7

Imaging, and were also the shareholders of True Imaging Management Corporation–the manager of True Imaging–and Hogle Bros.–the landlord for True Imaging. Most importantly, True Imaging planned to share the facility with Matt Hogle's chiropractic practice. Thus, True Imaging was intimately tied to Defendant Matt Hogle, both individually and in relation to his chiropractic practice. Under this set of circumstances, recent disciplinary action against Matt Hogle was material to potential investors, so it was a material omission under A.R.S. § 44-1991.

### ii. The Hogles never disclosed their lack of experience in managing a medical imaging center

The Plaintiffs allege that the Hogles' failure to disclose their lack of experience constitutes a material omission. The Court agrees. The PPM states that the management of True Imaging was to be True Imaging Management Corporation, an Arizona corporation comprised of shareholders Matt Hogle and Harold Hogle. The PPM assigns a variety of rights and responsibilities to True Imaging Management Corporation as the "Manager." As the controlling shareholders of True Imaging Management Corporation, the Hogles were, in essence, the management of True Imaging. The Defendants respond in two ways. First, they contend that they never intended to manage the operations of the medical imaging center and hired an individual for this specific purpose. Second, Defendants argue that each investor met with Matt Hogle prior to their investment, and each knew that Matt Hogle was a chiropractor and Harold Hogle was a building contractor. The PPM does not disclose either of these facts; it only refers to the Hogles, through True Imaging Medical Management Corporation, as the management. There is no reference in the PPM to the individual manager described by the Defendants, and there is no section on the relevant background–or lack thereof–of management. The Court finds that the failure to disclose the Hogles' lack of experience constitutes a material omission under A.R.S. § 44-1991.

### iii. The Hogles told Plaintiffs that True Imaging would pay a certain amount of rent under the lease with Hogle Bros. and later paid a greater amount of rent

Initially, the PPM stated that True Imaging would pay Hogle Bros. rent of

$6625.00 per month. Later, True Imaging issued a supplement to the PPM stating that the amount would increase to $11,000 per month. Plaintiffs allege that this was a misrepresentation because Hogle Bros. actually charged Tue Imaging $18,000 per month. The Defendants do not deny that Hogle Bros. charged a rental rate of $18,000 per month, but instead attempt to justify the increased rent as an attempt by Hogle Bros. to recoup money provided to purchase equipment used by True Imaging. Additionally, Defendants contend that, regardless of what is set forth in the lease document, True Imaging did not actually pay the rent due, or even the lower rent set forth in the PPM and supplement.

Defendants' arguments are essentially equitable in nature and do not address the standard set forth under Arizona securities law. As previously stated, to prevail under A.R.S. § 44-1991, a plaintiff must merely show that the statements were material and misleading; it is not necessary to show that the defendant knew they were false at the time the statements were made. <u>Aaron</u>, 196 Ariz. at 227. In this case, the Hogles, as the controlling persons of True Imaging, represented that True Imaging would pay a certain amount in rent, but later caused Hogle Bros.–a company within their control–to charge True Imaging significantly more. Thus, the purported justifications[3] do not change the fact that the statements made in the PPM and Supplement were misleading and material to a reasonable investor.

### iv. The Hogles state that the lease with Hogle Bros. would begin on January 1, 2008 but True Imaging was charged rent starting in May 2007

The Plaintiffs base this allegation on the lease itself, executed on January 1, 2008, and the schedule of rent payments showing that True Imaging was charged for rent dating back to May 2008. In fact, the PPM states that the proposed lease with Hogle Bros. had not yet been executed and made no assurances that it would lease the space from Hogle Bros. The PPM does not list January 1, 2008 as the date on which the lease would commence. It merely states that

---

**3.** The Court does note that, while it may or may not be true that True Imaging paid far less than the rent due under the lease with Hogle Bros., evidence shows that True Imaging made at least some rental payments actually exceeding $18,000 per month.

9

subscription proceeds would be refunded if a lease was not entered into on or before April 30, 2008. Any alleged misrepresentations made by the Hogles regarding the commencement of the lease would have occurred outside the context of the PPM. Because no misrepresentations were made regarding the commencement of the lease in relation to the PPM and the sale of securities, the Court cannot find a violation of Arizona securities fraud law on this matter.[4]

### v. The Hogles stated that True Imaging would pay for $35,000 in tenant improvements but True Imaging actually paid at least $340,000

The Plaintiffs contend that the Hogles knew that improvements would cost approximately $600,000, intended True Imaging to pay that full amount, and, in fact, caused True Imaging to pay Hogle Bros. $340,000 before the executed lease began. This allegation focuses on allegedly improper allocation of tenant improvement costs to True Imaging. The use of these funds prior to the authorized time period, which is tied to either the execution of the lease or purchase of equipment, is a separate allegation addressed below in Part vii.

In any event, the Defendants explain that the draft lease attached to the PPM provided that the tenant–True Imaging–would pay the first $35,000 in improvements, the landlord–Hogle Bros.–would pay the next $120,000, and the tenant was responsible for all further improvements. These terms were later incorporated into the executed lease. The Defendants assert that the improvements cost $634,233.19 and that True Imaging paid $391,000. Taken as true, this would mean that True Imaging actually paid less than what it owed under the lease. The Court finds that this matter is a triable issue of fact and inappropriate for resolution on summary judgment.

### vi. The Hogles represented to the Plaintiffs that they either had the MRgFUS or had the ability to acquire the MRgFUS yet never acquired the MRgFUS

The Plaintiffs rely on two documents issued in conjunction with the sale of an interest in True Imaging– "True Imaging LC: The Opportunity" ("The Opportunity") and

---

**4.** For purposes of this decision, the Court is only focusing on the limited issues raised in the Motion for Partial Summary Judgment.

10

"Executive Summary for True Imaging, LC" ("Executive Summary") in support of this allegation. The Opportunity includes a section entitled "Our technology" that lists various pieces of medical imaging equipment and a separate section entitled "Magnetic Resonance guided Focused Ultrasound Surgery." The latter section describes the machine (the "MRgFUS") and its then-pending approval by the FDA. The Executive Summary states True Imaging is "very excited to announce our ability to acquire the newest technology in healthcare for the imaging and treatment of cancer, Magnetic Resonance guided Focused Ultrasound Surgery (MRgFUS)" and that it was "poised and ready to help bring this treatment to the mainstream of our everyday lives." The Executive Summary lists all of the equipment it planned to purchase and explicitly states: "And of course we will have the Magnetic Resonance guided Focused Ultrasound." Finally, the Executive Summary concludes by saying that the MRgFUS would be True Imaging's "Ace in the Hole."

Defendants counter that, because True Imaging was only able to raise $2,647,390.20 through the offering rather than the limit of $8,000,000, True Imaging did not have sufficient funds to actually purchase the MRgFUS. Moreover, they argue, the PPM provided that the utilization of the proceeds was at the discretion of the company's Manager and might change based on events that occurred during or after the offering.

The Court finds the Defendants arguments unpersuasive. The Offering and the Executive Summary make numerous assertions that True Imaging would acquire this piece of equipment. Moreover, these representations were material, because the MRgFUS was central to True Imaging's business plan. This piece of equipments was supposed to set True Imaging apart. Indeed, the Executive Summary goes so far as to call it the company's "Ace in the Hole." True Imaging's short, blanket statement that utilization of proceeds was at the discretion of management is not enough to overcome the misrepresentations that True Imaging would acquire the MRgFUS.

> **vii. The Hogles told the Plaintiffs that their investments would be held in a segregated account and would not be accessed until True Imaging either**

11

**purchased equipment or entered into a lease, but more than $340,000 of Plaintiffs' funds were spent months before either of those events occurred.**

While it is unclear whether the Hogles improperly allocated the costs of tenant improvements between True Imaging and Hogle Bros., Plaintiffs assert that any use of investor funds was improper because certain conditions precedent had not been satisfied. The PPM states:

> Investors' funds will be held in a segregated Company account at a local bank in the metropolitan Phoenix area pending the sale of additional Units or until the Company purchases or enters into a purchase agreement to purchase certain medical imaging equipment or the Company enters into a lease with HB LLC (as defined below). Any investors' funds received after Company purchases or enters into a purchase agreement to purchase certain medical imaging equipment or the Company enters into a lease with HB LLC, shall immediately be available to the Company for use in the Company's operations and/or expenses.

Plaintiffs contend that the Hogles caused True Imaging to use investors funds prior to either purchasing medical imaging equipment or entering into a lease with Hogle Bros. In fact, True Imaging never purchased any medical equipment; Hogle Bros. purchased the equipment.

Thus, the only avenue for True Imaging to begin accessing investors' funds was to enter into a lease with Hogle Bros. Plaintiffs allege that True Imaging paid around $340,000 to Hogle Bros. for tenant improvements in the leased space prior to January 1, 2008, the date that True Imaging and Hogle Bros. entered into a lease. Matt Hogle admitted that these funds were used prior to January 1, 2008. Matt Hogle stated that the "lease was presumed" by the parties to begin prior to January 1, 2008, but no evidence was offered to confirm that, and it directly contradicts the terms of the lease itself. The Defendants argue that the $340,000 utilized by True Imaging during this period of time was not restricted, because it came from two other investors who did not base their investments on the PPM. The Defendants offer a balance sheet dated December 31, 2007 showing the investments from several investors, including the two investors cited by the Defendants. The investments from these two investors totaled $400,000 at that time. Nonetheless, the Defendants have offered no evidence that these investments were properly

12

segregated, nor that the segregated funds not subject to the PPM were those, in fact, used for the tenant improvements. Therefore, the Court finds that the Defendants used Plaintiffs' funds contrary to the terms of the PPM, and this constitutes a material misrepresentation.

### viii. The Hogles led Plaintiffs to believe that True Imaging had counsel while in fact the PPM was prepared by an attorney representing only the Hogles' interest.

The PPM provides:

> Legal counsel to the Company may represent the Company and its Manager after the consummation of this Offering. Such counsel has not acted independently on behalf of the investors. Each investor must rely upon his own legal counsel for advice in connection with an investment in the Company.

The PPM does not reveal the identity of legal counsel to the Company, but it implies that True Imaging had separate legal counsel. The first sentence only makes sense if the focus is on whether the Company's legal counsel may also represent the Manager, an affiliate controlled by the individuals, at a later point in time: to wit, after the consummation of the offering. The next sentence indicates that True Imaging had an attorney by stating: "counsel has not acted independently on behalf of the investors." The Defendants admitted in a state court pleading, however, that the attorney who authored the PPM never represented True Imaging. The attorney must then have been representing the Hogles in their individual capacity, rather than True Imaging. This constitutes both a material misrepresentation that True Imaging had obtained an attorney as well as a material omission that the attorney only represented the interests of the Hogles.

### ix. The Hogles represented that True Imaging would purchase medical imaging equipment but never did so.

Although not explicitly alleged in the Motion, Plaintiffs' counsel raised this additional allegation at oral argument, and the Court found sufficient supporting material in the Statement of Facts in order to make a ruling. It is represented numerous times throughout the PPM that True Imaging would purchase medical imaging equipment. For instance, in "Section

13

VI: Use of Proceeds," the PPM places the purchasing of medical imaging equipment first in a list of intended use of proceeds. In fact, it is recited throughout the PPM that investors would receive a refund of their subscription proceeds if True Imaging did not either purchase medical imaging equipment or enter into a lease with Hogle Bros. As the PPM makes clear, the purchase of medical imaging equipment was central to the business objectives of True Imaging.

The Hogles employed other materials in connection with promoting True Imaging that likewise emphasized the importance of the medical imaging equipment to True Imaging's business. For instance, The Opportunity includes a section entitled "Our Technology." The list includes a 1.0 Tesla Short bore MRI, Multi-Slice CT, Digital Mammography and the MRgFUS. Another document, the Executive Summary includes a section outlining how True Imaging would select equipment to purchase, and includes another section describing the "wide variety of imaging equipment types" that True Imaging would utilize. The Executive Summary also provides a "cost breakdown of the equipment worth *in our center*." (Emphasis added). The list sets forth approximately $5 million worth of equipment in total.

Thus, the Hogles represented–via the PPM, The Opportunity, and The Executive Summary– that True Imaging either had the equipment or had the ability to obtain the equipment. As it turned out, True Imaging never owned or acquired any of the medical imaging equipment as represented. Instead, Hogle Bros. acquired some of the equipment listed in the promotional material materials, which apparently allowed True Imaging to operate for a period of time. Nonetheless, the Hogles made representations that True Imaging itself would acquire medical imaging equipment. These representations were made throughout the promotional materials and would be material to a reasonable buyer. The failure of True Imaging to acquire any of the critical equipment makes these material misrepresentations.

## IV. CONCLUSION

Based upon the foregoing, the Court concludes that the Hogles made material misrepresentations in connection with promoting investments in True Imaging in violation of

14

A.R.S. § 44-1991. Having found that the Defendants violated Arizona securities fraud laws, many of the claims of the Plaintiffs related to their investments in True Imaging must be deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(19). The Plaintiffs' Motion for Partial Summary Judgment is granted, in part, and denied, in part. Since not all of the claims necessarily result in summary judgment, it is unclear to this Court whether the Plaintiffs wish to proceed on the remaining claims. It also appears that A.R.S. § 44-1991(B) may limit the amount of damages that may be awarded under A.R.S. § 44-1991(A)(2). The Court has simply concluded that certain claims of the Plaintiffs have resulted in a non-dischargeable debt, the amount of which has not yet been determined by this Court. Therefore, the Court will set a 7016 Conference to determine how the parties wish to proceed in light of the Court's ruling.

IT IS ORDERED setting a 7016 Conference on this matter for the 24th day of April, 2013, at 2:30 p.m., in Courtroom 701, United States Bankruptcy Court, 230 N. First Avenue, 7th Floor, Phoenix, Arizona 85003.

DATED this 13th day of March, 2013.

*[signature]*

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

15